[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties to this action were married on January 26, 1975. CT Page 4704 The plaintiff had begun to work for the defendant in January of 1970 as his secretary. At that time, Mr. Adler was married and a general contractor in Stamford, Connecticut. Plaintiff was 25 years old at the time, married and living with her first husband.
The plaintiff testified that in December of 1970 they began a relationship, which blossomed in the spring of 1971 and continued through her divorce in August of 1972. Mr. Adler was divorced in August of 1974. The parties lived together in Danbury prior to their divorces. The plaintiff testified that they built a house together in Wilton, discussed having children, and ultimately-married in January of 1975. The plaintiff testified that the defendant insisted on a prenuptial agreement prior to their marriage, which agreement is Plaintiff's Exhibit #2 in this proceeding. The plaintiff testified that their marriage was wonderful until after Mr. Adler's retirement. Subsequent thereto, the plaintiff complained that there was a great deal of work to do on the property in Norfolk which had more than forty sheep. They spent too much time together, and she felt that he asked too much of her. She believed that their marriage was breaking down for the last three or four years. The plaintiff testified that she tried talking to the defendant and felt that she was "his servant." Thereafter, she realized that there was more to life than doing what he said.
Mr. Adler testified that they took many trips during the year. He thought the home in the Dominican Republic and those trips indicated to her his concern about the amount of work she complained of, and that they shared a rather nice life together. When she objected to being away from Norfolk for extended periods in the winters, they took shorter trips.
Mr. Adler may have been the dominant person in their marriage, but she did not claim that he was abusive. The defendant held the purse strings, but despite having three children from his previous marriage, he thought enough of the plaintiff to provide well for her, both during their marriage, and in contemplating his death, if they remained married. It appeared to the court that this rather long second marriage of fourteen years would have continued had the plaintiff not involved herself in a romantic relationship that started simply enough over Friday night card games with the parties and Mrs. Adler's new interest, Robert Brasche.
In July of 1989, the plaintiff left the marital home. The plaintiff indicated that as of the fall of 1988 she had no sexual relationship with her husband, but did not know how to leave him. She also complained that he had some changes of temperament prior to her leaving and did not feel free to complain to him about her concerns.
During cross examination of the plaintiff, it was agreed that the plaintiff had Mr. Brasche as a house guest in February of 1989 at the parties' residence in the Dominican Republic, while both were vacationing there. It was after that vacation in the Dominican Republic that Mrs. Adler and Mr. Brasche planned how Mrs. Adler would separate from her husband. CT Page 4705 On July 19, 1989 Mr. Brasche accompanied Mr. Adler to an auction with respect to a car which Mr. Adler had an interest in. Mrs. Adler left the home while Mr. Brasche and Mr. Adler were out. Mr. Brasche and Mrs. Adler planned that they would meet thereafter at the Red Bull Motel in Waterbury. The plaintiff testified that she began a sexual relationship with Mr. Brasche the next day. She did agree during cross examination that their physical relationship began in the fall of 1988.
Mr. Adler testified that he first realized the marriage was in trouble on July 9, 1989. He testified that he was flabbergasted, outraged, and that it "had destroyed" him. In fact, Mr. Adler testified that he had been under the care of a psychiatrist from July of 1989 through June of 1990 because of the breakup of the marriage and the way in which the breakup occurred. He indicated at the time of the separation that his will provided that Mrs. Adler would receive fifty (50) percent of his estate and that he placed their home in Norfolk and in the Dominican Republic in joint names so that she would have these assets, assuming that he would predecease her. The defendant is twenty-one years (21) her senior. He also placed a certain amount of cash in her name to pay for his funeral.
It was established at trial, and the court did in fact find and enter judgment on July 31, 1990 of irretrievable breakdown of the marriage. A decree of dissolution entered. The salient claim of both parties is that this court enforce the antenuptial agreement referred to earlier. At first blush it may appear an easy task; however, the plaintiff claims that a constructive trust should be imposed in addition to the express elements of the antenuptial agreement. The parties own property jointly at 776 Winchester Road in Norfolk, Connecticut, as well as property in the Dominican Republic. Those properties, because they are in joint names, can be dealt with easily though the auspices of the antenuptial agreement. The stipulated value of the Dominican Republic property as of March 19, 1990, was $69,000.00, and the parties stipulated to that value at trial.
With respect to the property at 776 Winchester Road, Norfolk, Connecticut, the court heard testimony from two appraisers, one for the plaintiff and one for the defendant with respect to the value of that marital home. The plaintiff's expert valued the property at $450,000, initially, but as of the date of testimony, he indicated there had been a 5% decrease and the fair market value at the time of trial was $425,000. He indicated that there would be a decreasing market value. The defendant's appraiser valued the property at the marital homestead at $365,000. The court has reviewed both appraisals as well as the testimony of each appraiser and finds that the fair market value of this property at the time of trial was $425,000.
At issue is property at 775 Winchester Road in Norfolk, Connecticut valued by plaintiff's appraiser at $155,000 and defendant's appraiser at $108,000, which consists of a barn, shed and farmland of 3.46 acres, which was conveyed from the Adlers to Riggs Hill Farm, Incorporated on CT Page 4706 July 1, 1981. Also, during the course of the marriage, the parties acquired a property at 147 Chapel Hill in Winchester Center from which there was a capital gain of $56,629.77. The home in Winchester Center was acquired in 1984, rehabilitated, and sold a year and a half later. The plaintiff testified that she did a considerable amount of work on the rehabilitation of that home, although all of the properties were agreed to have been acquired by the use of Mr, Adler's funds.
The defendant testified with respect to the gain on 147 Chapel Hill in Winchester Center that the proceeds simply went into his investment portfolio. He also testified that there was no agreement with respect to the transfer back to Mrs. Adler of 50% of the shares of the corporation, Riggs Hill Farm, Incorporated. When the court reviews the issue of the constructive trust with respect to these two parcels of property, the court also looks at the history of the relationship as to whether or not a constructive trust was contemplated or could be construed. It is clear based on the testimony of the plaintiff and the acknowledgment by the defendant that he was the major earner in the family; that Mrs. Adler felt that he had a primary role in the relationship especially with respect to financial issues, but that he had also transferred assets into her name and out of her name and was prepared in a testamentary instrument had the marriage survived to yield her one-half of all of his property. The credible testimony demonstrates that Mrs. Adler had no prior expectation that she was to receive proceeds from either the transfer into the corporation or the sale of the Winchester Center home.
Paragraph 3 of the antenuptial agreement considers the transfer of assets within the marriage:
 "Notwithstanding the provisions of this Agreement, either party shall have the right to transfer or convey to the other any property or interest therein which may be lawfully conveyed or transferred during his or her lifetime or by will or otherwise upon death, and neither party intends by this Agreement to limit or restrict in any way the right and power to receive any such transfer or conveyance from the other."
The plaintiff now seeks to negate the above-quoted portion of the Agreement and to impose a constructive trust on the previously described assets. Antenuptial agreements are enforceable where three conditions are satisfied: (1) the contract was validly entered into; (2) the terms do not violate statute or public policy; (3) the circumstances of the parties at the time the marriage dissolved were not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work an injustice. McHugh v. McHugh, 181 Conn. 482, 485
(1980). The parties must also be aware that they are waiving certain legal rights and must engage in full financial disclosure for an antenuptial agreement to be valid, Id. Since all of these conditions have been met, the agreement is enforceable, Moreover, both parties have CT Page 4707 asked this court to enforce the Agreement.
The plaintiff relies on the cases of Hieble v. Hieble, 164 Conn. 56
(1972) and Koizim v. Koizim, 181 Conn. 492 (1980) in seeking to establish a constructive trust. However, in those cases, there were agreements to sell property and promises to divide assets. As noted earlier, the plaintiff had no such expectation that she would receive a financial benefit from the conveyance of property transferred during the marriage. (See Prenuptial Agreement paragraph three.) A constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. Brown v. Brown, 190 Conn. 345,349 (1983), Cohen v. Cohen, 182 Conn. 193, 203 (1980). The prenuptial agreement did not grant the plaintiff the right to take a portion of the disputed assets and there exists no credible evidence that the plaintiff was induced to convey certain property in return for money or an interest in Riggs Hill Farm. Therefore, it would be inappropriate to impose a constructive trust. Furthermore, the antenuptial agreement did not mandate conveyances into Mrs. Adler's name, and the passage of assets into and out of her name were permissible under its terms. Mrs. Adler was not disenfranchised by the conveyances out by her. Rather, she has retained significant assets in those jointly-held properties.
Financial Awards.
1. The defendant shall pay to the plaintiff the sum of $100.00 per week in periodic alimony until she remarries or dies according to the antenuptial agreement.
2. The defendant shall pay to the plaintiff as lump sum alimony by way of distribution of marital assets, the sum of $247,000; that being one-half of the value found by this court of the property at 776 Winchester Road, Norfolk, Connecticut and one-half of the value of the Dominican Republic property.
3. The court will order the parties to attempt to divide the personalty in the marital home at 776 Winchester Road in Norfolk, Connecticut and in the Dominican Republic property. If they cannot so agree within sixty (60) days of the date of judgment, then they shall hire a mediator to be approved by the court to complete the distribution of personalty in the marital homes.
Judgment shall enter accordingly.
DRANGINIS, JUDGE